No. 23-5755, 23-5756

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT
————————————

**UNITED STATES OF AMERICA**,
*Plaintiff—Appellee,*

*v.*

**BRIAN KELSEY**,
*Defendant—Appellant.*
————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE, NASHVILLE DIVISION
THE HONORABLE WAVERLY D. CRENSHAW JR., CHIEF DISTRICT JUDGE
CASE NO. 3:21-cr-00264-1
————————————

## APPELLANT'S OPENING BRIEF
————————————

J. ALEX LITTLE
ZACHARY C. LAWSON
Burr & Forman LLP
222 2nd Avenue South, Suite 2000
Nashville, Tennessee 37201

*Counsel for Appellant*

November 14, 2023

**ORAL ARGUMENT IS REQUESTED**

# TABLE OF CONTENTS

Page(s)

TABLE OF CONTENTS ............................................................... i

TABLE OF AUTHORITIES ......................................................... iii

STATEMENT IN SUPPORT OF ORAL ARGUMENT ........................... v

STATEMENT OF JURISDICTION ................................................. 1

STATEMENT OF THE ISSUE .................................................... 2

STATEMENT OF THE CASE ..................................................... 3

    The Indictment ................................................................. 3

    The Plea Agreement ........................................................... 4

    The Motion to Withdraw the Plea ....................................... 8

    The Presentence Report ..................................................... 9

    The Government's Sentencing Filing .................................. 10

    The Sentencing Hearing ................................................... 11

    Bail Pending Appeal ........................................................ 14

SUMMARY OF THE ARGUMENT ............................................... 15

ARGUMENT ......................................................................... 17

I.    THE GOVERNMENT MUST STRICTLY ADHERE TO PLEA AGREEMENTS ........................................................... 17

II.   THE GOVERNMENT BREACHED MR. KELSEY'S PLEA AGREEMENT ................................................... 19

III.  NOTHING IN THE AGREEMENT PERMITTED THE GOVERNMENT TO RECOMMEND A 2-LEVEL UPWARD ADJUSTMENT UNDER §3C1.1 ........................ 23

# TABLE OF CONTENTS
## cont.

Page(s)

A.  *The Agreement's language prohibits what the government did here* ........................................... 25

B.  *The government interpreted the same language very differently in prior cases* ..................................... 31

IV.  THE COURT SHOULD REMAND TO GIVE MR. KELSEY THE OPPORTUNITY TO WITHDRAW HIS PLEA ............................................................... 36

CONCLUSION ................................................................. 37

CERTIFICATE OF COMPLIANCE ...................................... 38

CERTIFICATE OF SERVICE ............................................... 39

APPELLANT'S DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS ............................................ 40

# TABLE OF AUTHORITIES

CASES                                                          Page No.

*Cohen v. United States,*
    593 F.2d 766 (6th Cir. 1979) ......................................................... 18

*Lovett v. Cole,*
    584 S.W.3d 840 (Tenn. Ct. App. 2019) ......................................... 29

*Maggart v. Almany Realtors, Inc.,*
    259 S.W.3d 700 (Tenn. 2008) ......................................................... 26

*Santobello v. New York,*
    404 U.S. 257 (1971) ............................................................. 17-21, 36

*United States v. Barnes,*
    278 F.3d 644 (6th Cir. 2002) ......................................................... 22

*United States v. Fitch,*
    282 F.3d 364 (6th Cir. 2002) ....................................... 18-22, 29, 35

*United States v. Foster,*
    527 F. App'x 406 (6th Cir. 2013)............................................. 22, 36

*United States v. Ligon,*
    937 F.3d 714 (6th Cir. 2019) .............................................. 18-22, 35

*United States v. Mizell,*
    671 F. App'x 826 (2d Cir. 2016) ............................................. 34-35

*United States v. Moncivais,*
    492 F.3d 652 (6th Cir. 2007) ................................................... 17, 24

*United States v. Swanberg,*
    370 F.3d 622 (6th Cir. 2004) ......................................................... 22

# TABLE OF AUTHORITIES
## cont.

<u>CASES</u> cont.                                                                    <u>Page No.</u>

*United States v. Warren*,
   8 F.4th 444 (6th Cir. 2021) ................................................. 17-24, 35

*Wilson v. Moore*,
   929 S.W.2d 367 (Tenn. Ct. App. 1996) ...................................... 27-29

<u>FEDERAL STATUTES</u>

18 U.S.C. § 3143(b) ................................................................. 14

18 U.S.C. § 3231 ..................................................................... 1

28 U.S.C. § 1291 ..................................................................... 1

<u>FEDERAL REGULATIONS AND RULES</u>

Fed. R. App. P. 4(b)(1)(A)(i) .................................................... 1

Fed. R. Crim. P. 11(c)(1)(B) ............................................... *passim*

U.S.S.G § 3C1.1 ........................................................... *passim*

U.S.S.G § 3E1.1(a) ................................................................. 6

U.S.S.G § 3E1.1(b) ................................................................. 6

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Although the legal issues are straightforward, Appellant respectfully requests oral argument to ensure that the Court and the Appellant are afforded a clear understanding of the government's stance. Below, the government abandoned arguments it made in writing when later questioned by the district court. Oral argument will permit the Court and the parties to address any similar issues here.

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this criminal prosecution under 18 U.S.C. § 3231, and it entered a judgment against the Appellant on August 16, 2023. (R. 155: Judgment, Page ID # 1103.)

The Corrected Notice of Appeal was filed on August 22, 2023, shortly after the judgment was entered, (R. 160, Page ID # 1257), making it timely under Fed. R. App. P. 4(b)(1)(A)(i).

This Court's appellate jurisdiction arises from 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

The Supreme Court and this Court have held that a defendant's judgment should be vacated when the government advocates at sentencing in a manner contrary to the parties' plea agreement.

Here, Brian Kelsey executed a written agreement with the government that restricted the recommendations the parties could make to the district court about how to calculate the Offense Level. After Mr. Kelsey attempted to withdraw his guilty plea, the Probation Office recommended a two-level upward adjustment for Obstruction of Justice. This is an enhancement that the parties had disavowed in the agreement.

1.    Did the government breach the plea agreement by advocating for the district court to apply this enhancement when calculating the Sentencing Guidelines?

## STATEMENT OF THE CASE

This case involves the government's breach of a plea agreement.

Brian Kelsey was a practicing attorney and state lawmaker for nearly two decades, including as a member of the Tennessee Senate from 2009 to 2022. In 2016, he ran for an open seat in the U.S. House of Representatives, where he finished fourth in the primary. About five years later, the government indicted Mr. Kelsey, along with co-defendant Joshua Smith, for campaign finance violations related to his congressional run.

### *The Indictment*

The indictment alleged five counts: conspiracy (Count I), "soft money" to a federal candidate (Count II), "soft money" from a state officeholder (Count III), making excessive contributions (Count IV), and accepting excessive contributions (Count V). (R. 1: Indictment, Page ID # 1-12.)

The charges related to the transfer of funds from Mr. Kelsey's State Senate campaign committee to a federal political action committee ("PAC"). (*Id*.) The indictment alleged that Mr. Kelsey wrote a check from his state campaign committee account to a state PAC, the Standard Club

PAC, operated by Smith. (*Id.* at Page ID # 7.) According to the indictment, Smith then transferred the funds (while acting as Kelsey's agent) from Standard PAC to a federal PAC operated by unindicted co-conspirator Andrew Miller (*Id.* at Page ID # 7-12.) Allegedly at the direction of Kelsey and an unindicted co-conspirator named Jeremy Durham, these funds were later transferred to the American Conservative Union ("ACU") to fund radio advertisements that urged voters to support Kelsey in his congressional race. (*Id.*)

The ACU reported to the FEC that it purchased about $80,000 worth of radio advertisements supporting Mr. Kelsey. (*Id.* at Page ID # 8-9.) In the government's view, because ACU's expenditures were allegedly coordinated by Mr. Kelsey's agent, these were direct contributions to his federal campaign above the federal contribution limits.

### *The Plea Agreement*

In November 2022, Mr. Kelsey and the government executed a written plea agreement ("Agreement") that was heavily negotiated by his prior counsel and the prosecutors. (R. 73: Plea Agreement, Page ID # 206.)

The 17-page Agreement is divided into eleven sections containing 81 paragraphs and sub-paragraphs. (*Id.* at Page ID # 206-22.) The sections include specific topics, such as "Charges to Which Defendant is Pleading Guilty," "Factual Basis," and "Sentencing Guidelines Calculations," and more general catchall categories of contractual language, such as "Other Terms" and "Conclusion." (*Id.*)

On the first page, the parties state that they have "entered into an agreement" "pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure." (*Id.* at Page ID # 206.) This Rule permits pleas in which "an attorney for the government" will "recommend," among other things, "that a particular provision of the Sentencing Guidelines . . . does or does not apply." Fed. R. Crim. P. 11(c)(1)(B). That is what happened here, and these recommendations were contained in paragraph 9 of the Agreement. (*Id.* at Page ID # 215-16.)

There, beneath a header titled "Offense Level Calculations," the parties "agree[d] to recommend" six specific things to the Court related to the calculations of the Offense Level under the Sentencing Guidelines. (*Id.*) This included a promise in paragraphs 9(a)(i) to (iv) that they would recommend a "base offense level" of 8 and three upward adjustments

totaling an increase of 10 levels—for a maximum offense level of 18. (*Id.* at Page ID # 215.) At the same time, subject to certain conditions, the parties agreed that they would recommend that the Court calculate an Offense Level as low as 15 if the terms of sub-paragraph 9(a)(v) were met. (*Id.* at Page ID # 215-16.) There, the government agreed to recommend a 2-level reduction in the offense level for "acceptance of responsibility" pursuant to § 3E1.1(a) and another 1-level reduction pursuant to § 3E1.1(b). (*Id.*) But unlike the recommendations the parties bargained for in paragraphs 9(a)(i) to (iv), this 3-level reduction was only "warranted" if the government were satisfied that Mr. Kelsey had "clearly demonstrate[d] his acceptance of responsibility." (*Id.*)

Thus, the parties agreed that the highest offense level either party would recommend to the Court would be 18 (8 + 6 + 2 + 2). And that, if the government were satisfied that Mr. Kelsey accepted responsibility, the lowest offense level they would recommend would be 15 (18 - 3). Critical here, in the next and final sub-paragraph under "Offense Level Calculations," 9(a)(vi), the parties further "agree[d] that no additional upward or downward adjustments [were] appropriate." (*Id.* at Page ID # 216.) The provision at issue on appeal, Obstruction of Justice, is an

"upward . . . adjustment" to the Offense Level calculations pursuant to § 3C1.1 of the Sentencing Guidelines. Under the Agreement, such an enhancement was *not* "appropriate." (*Id*. at Page ID # 215-16.)

Further down in the Agreement, in paragraph 9(c), the parties included an acknowledgment that Mr. Kelsey understood the consequences of a so-called "B" plea—"that the Court determines both the final offense level and the final guidelines range" and that a defendant has "no right to withdraw his guilty plea" "if the Court does not accept the guidelines calculations of the parties." (*Id*. at Page ID # 216.) This paragraph also includes a provision clarifying that "[i]n the event that the Probation Office or the Court contemplates any U.S.S.G. adjustments, departures, or calculations different from those recommended above, the parties reserve the right to answer any inquiries and to make all appropriate arguments concerning the same." (*Id*.) Nothing in this paragraph, or any other provision of the Agreement, allowed either party to recommend an Offense Level calculation other than the calculations described in paragraphs 9(a)(i) to (vi).

On November 22, 2022, Mr. Kelsey, his counsel at the time, and three prosecutors signed the Agreement. (R. 73: Plea Agreement, Page

ID # 221-22.) The district court held a plea hearing that day. (R. 71:
Minute Entry for Plea Hr'g, Page ID # 198.) Consistent with the
Agreement, Mr. Kelsey entered a guilty plea to Counts 1 and 5 of the
indictment. (*Id.*)

### *The Motion to Withdraw the Plea*

Later, Mr. Kelsey moved to withdraw his plea and asked the district
court for permission to file a motion to dismiss. (R. 93: Motion to
Withdraw Plea and File Motion to Dismiss, Page ID # 285.) As a basis for
the motion to dismiss, Mr. Kelsey argued that he pleaded guilty to
something that is not a crime because the First Amendment protected
his conduct. (*Id.* at Page ID # 290-97.) As a basis for the motion to
withdraw, he argued that he had entered the plea with a confused mental
state shortly after his twin sons were born and while his father was on
his death bed in home hospice care. (*Id.* at Page ID # 297-98.)

The district court held a hearing on the motion to withdraw, at
which Mr. Kelsey testified. (R. 114: Minute Entry for Motion to Withdraw
Plea, Page ID # 458.) At the end of the hearing, the court denied the
motion, and the case proceeded to sentencing. (R. 116: Order, Page ID
# 460.)

### *Presentence Report*

After the district court denied Mr. Kelsey's motion to withdraw, the Probation Office issued a revised presentence report ("PSR") revoking the three points for acceptance of responsibility it had calculated in its original draft and adding two levels to the offense level for obstruction of justice. (R. 167: Revised Presentence Report, Page ID # 1335-36.) The Probation Office deemed the two-level enhancement appropriate because, at his original plea hearing, Mr. Kelsey had "misrepresented to the Court that he was guilty of a crime that he did not commit." (*Id*. at Page ID # 1348.)

After the revised PSR was disclosed, the parties provided their objections and input to the Probation Office, and these communications were documented in the PSR's Addendum. (*Id*. at Page ID # 1347-49.) Mr. Kelsey objected to the obstruction enhancement. (*Id*. at Page ID # 1347-48.) The government did not have any objections and, as described by the Probation Office, "note[d] that the plea agreement includes language that no additional upward or downward adjustments are appropriate. As such, the Government will not advocate for the Obstruction of Justice enhancement." (*Id*. at Page ID # 1347.)

### *The Government's Sentencing Filing*

This promise proved short-lived.

The first cracks appeared in the pleading the government filed regarding its position on the PSR. (R. 135: Position Regarding Presentence Report, Page ID # 794-95.) After noting that the Probation Office had recommended "an additional 2-level increase for obstruction of justice," it provided some facts it deemed relevant to the question. (*Id.* at Page ID # 794.) But, in line with the Agreement, the government reminded the district court that the parties had agreed that "'no additional upward or downward adjustments [to the offense level] are appropriate' beyond those listed in the agreement." (*Id.* at Page ID # 794-95.) And, so, it "maintain[ed] that, despite the defendant's subsequent attempt to withdraw his pleas and perjury, th[e] Court should accept the original plea agreement." (*Id.* at Page ID # 795.) The resulting recommendation was simple enough: "As a result" of the plea agreement, "the government does not advocate for the application of the obstruction enhancement." (*Id.*)

Had that been all the government said on the matter, this appeal would not be before the Court. But the government could not leave well

enough alone. It followed its disavowal of the obstruction enhancement with the following invitation to the district court that—as it made clear later—it believed was an end-around the Agreement allowing it to advocate for the enhancement:

> Notably, though, the plea agreement states that, "[i]n the event that the Probation Office or the Court contemplates any U.S.S.G. adjustments, departures, or calculations different from those recommended [in the plea agreement], the parties reserve the right to answer any inquiries and to make all appropriate arguments concerning the same." DE 73 at 11. Therefore, if at the sentencing hearing the Court requests the government's assessment of whether the defendant's post-plea conduct falls within the definitions provided in § 3C1.1, the government will provide its assessment.

(*Id*.) But the government did not—at least at that point—say what its assessment might be.

### The Sentencing Hearing

This changed at sentencing. During the hearing, defense counsel argued against the obstruction of justice enhancement. (R. 157: Sent. Hr'g Tr., Page ID # 1141-43.) The Court then asked the government whether there was "[a]nything [it] want[ed] to say on the objection to the – to the obstruction of justice?" (*Id*. at Page ID # 1143.) The government said yes and began reading its position on the enhancement. (*Id*. at Page ID # 1143-44.) It first paid lip-service to the Agreement: "As the Court is,

11

of course, aware, that enhancement was not contemplated in the plea agreement between the parties, which, of course, was entered into before Mr. Kelsey moved to withdraw his plea. Therefore, the government defers to the Court on its application." (*Id.*)

But its purported deference to the Agreement did not last. In the next breath, the prosecutors took the district court's benign invitation to talk on the topic as an invitation to throw the Agreement out the window, stating, "However, consistent with the terms of the plea agreement, it appears the Probation Office and the Court is inquiring with respect to the propriety of that two-level enhancement." (*Id.* at Page ID # 1144.) Pouncing on what it viewed as a loophole, the government then argued explicitly that certain statements by Mr. Kelsey at his withdrawal hearing "were perjurious *and support[ed] application of the two-level enhancement.*" (*Id.* at Page ID # 1144-45) (emphasis added).

Defense counsel immediately raised alarm that the government had advocated for two additional offense levels in a manner contrary to the plea agreement: "[T]he government's come pretty close to violating the plea agreement. It sure sounds like they're advocating for those two points, and they can't do that." (R. 157: Sent. Hr'g Tr., Page ID # 1145.)

12

All parties understood that "those two points" referred specifically to the two additional levels that the Probation Office had included as an upward adjustment under U.S.S.G. § 3C1.1 in its calculation of the Offense Level. And all parties understood that defense counsel believed "they" (the prosecutors) could not do "that" for a specific reason: because it would "violat[e] the plea agreement." (*Id*.)

The district court quickly rejected the argument. And it immediately provided its basis for doing so—which aligned with the government's argument—dismissing the issue because "[it had] asked [the prosecutor] what he thought." (*Id*.) Defense counsel countered, "I understand, Your Honor. But if you ask him to violate the plea agreement, it doesn't mean he doesn't violate the plea agreement." (*Id*.) The Court did not respond and ultimately applied the enhancement to Mr. Kelsey's Offense Level, thereby increasing his sentencing range under the Guidelines. (*Id*. at Page ID ## 1146-51, 1154.) The Court then gave "substantial weight" to the Guidelines range in deciding his sentence. (*Id*. at Page ID # 1245-46.)

The district court sentenced Mr. Kelsey to 21 months' imprisonment on each count to run concurrently, followed by three years of supervised release. (R. 155: Judgment, Page ID # 1103-05.)

This appeal followed.

### *Bail Pending Appeal*

After Mr. Kelsey filed his notice of appeal, he moved for bail pending appeal under 18 U.S.C. § 3143(b), which requires a defendant to show that his appeal presents a "substantial question of law or fact" to prevail. 18 U.S.C. § 3143(b)(1). The district court granted the motion, finding that "Kelsey raises a substantial question by asserting the Government breached the plea agreement." (R. 177: Memorandum Opinion and Order, Page ID # 1435.)

## SUMMARY OF ARGUMENT

The government breached the plea agreement at the sentencing hearing. As a result, Mr. Kelsey did not get the benefit of his bargain, and he was denied due process. This Court should vacate the resulting judgment and remand.

Under the Agreement's plain terms, the government promised not to recommend that the district court calculate an Offense Level that was higher than 18. Specifically, it agreed to recommend a base offense level of 8 and then 10 levels of upward adjustments; it further "agree[d] that no additional upward or downward adjustments are appropriate." This meant that it could not advocate in favor or a 2-level upward adjustment for obstruction of justice under U.S.S.G. § 3C1.1 despite its views about Mr. Kelsey's testimony at the plea-withdrawal hearing. These obligations were never in doubt. The government restated them twice in writing (once to the Probation Office and once to the district court) prior to the sentencing hearing.

But at sentencing, perhaps frustrated by Mr. Kelsey's attempt to withdraw his plea, the government decided to recommend the additional 2-level adjustment anyway. As a result, the government recommended

that the court calculate a total offense level of 20, which was two levels higher than it promised in the Agreement. This advocacy breached the Agreement.

Despite the government's apparent belief that it had found an end-around the bargain it previously struck, there is simply no excuse for its breach. The law holds the government to "meticulous standards of performance" in fulfilling its promises in plea agreements. Here, the prosecutors fell far short. As a result, Mr. Kelsey did not receive one of the primary bargains contemplated by plea agreements under Rule 11(c)(1)(B): the prosecutor's recommendation to the court that certain provisions of the Sentencing Guidelines do *not* apply.

In turn, Mr. Kelsey's due process rights were violated. When a defendant gives up important constitutional rights in a plea bargain, he is entitled to receive the full benefit he bargained for. As a result, this Court should reverse his judgment and remand with instructions to allow Mr. Kelsey the option of rescinding the Agreement.

# ARGUMENT

## I.  THE GOVERNMENT MUST STRICTLY ADHERE TO PLEA AGREEMENTS.

The Supreme Court has held repeatedly that "when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Santobello v. New York*, 404 U.S. 257, 262 (1971). This is because a defendant has a due process right to hold the government to the promise it made that induced him to plead guilty. *Id.*; *United States v. Warren*, 8 F.4th 444, 448 (6th Cir. 2021).

The Court has made clear that courts must treat plea agreements like contracts, using "traditional principles of contract law" to interpret them and enforcing them "according to their literal terms." *Warren*, 8 F.4th at 448 (citations omitted). "But because defendants waive certain fundamental rights when they enter plea agreements, [courts] construe ambiguities against the government." *Id.* (cleaned up). And specifically with plea agreements, the Court has directed the lower courts to hold prosecutors to "meticulous standards of performance." *Id.* (citing *United States v. Moncivais*, 492 F.3d 652, 662 (6th Cir. 2007)) (cleaned up). "To satisfy these high standards," this Court has held that "the government

17

must do more than pay lip service to its obligations." *Warren*, 8 F.4th at 448 (citation omitted). In turn, the law "forbid[s] 'not only explicit repudiation of the government's assurances' but also 'end-runs around them.'" (*Id.*)

"In determining whether a plea agreement has been broken, courts look to what was reasonably understood by the defendant when he entered his plea of guilty." *United States v. Ligon*, 937 F.3d 714, 718 (6th Cir. 2019) (citation omitted). Here, again, "[a]mbiguities in a plea agreement must be construed against the government." *Id.* (citing *United States v. Fitch*, 282 F.3d 364, 367 (6th Cir. 2002)). And whether the breach affected the sentence does not matter: "[i]f the government breaches a plea agreement, a defendant is entitled to relief regardless of whether the district court was ultimately influenced by the breach and regardless of whether the breach was inadvertent." *Ligon*, 937 F.3d at 719; *see also Santobello*, 404 at 262-63 (ordering relief even though the sentencing judge "stated that the prosecutor's recommendation did not influence him"); *Cohen v. United States*, 593 F.2d 766, 772 (6th Cir. 1979) ("[T]he touchstone of *Santobello* is whether the prosecution met its

commitment and not whether the court would have adopted the government's recommendation.").

## II.    THE GOVERNMENT BREACHED MR. KELSEY'S PLEA AGREEMENT.

Because Mr. Kelsey's counsel objected to the government's argument for the upward adjustment under § 3C1.1, bringing it to the district court's attention and allowing the court to take appropriate corrective action, and because "a district court's construction of a plea agreement presents a question of law," this Court reviews the government's alleged breach of the plea agreement *de novo. Fitch*, 282 F.3d at 366; *see also Warren*, 8 F.4th at 448.

Here, the breach was clear and obvious: The government promised in paragraph 9 of the Agreement to recommend certain calculations that would limit the total offense level to between 15 and 18. (R. 73: Plea Agreement, Page ID # 215-16.) In doing so, the government specifically agreed to recommend three upward adjustments and (if conditions were met) one downward adjustment. Then, in paragraph 9(a)(vi), it "agreed that no other upward or downward adjustments are appropriate," thereby foreclosing either party from recommending that the district court apply myriad other adjustments, including the 2-level upward

adjustment for obstructing or impeding the administration of justice found in § 3C1.1. (*Id.* at Page ID # 216.)

But the government did not keep this promise. At sentencing, prosecutors explicitly recommended that the district court apply the 2-level upward adjustment under § 3C1.1. (R. 157: Sent. Hr'g Tr., Page ID # 1144-45.) The government's actions were not subtle or inadvertent: it told the court the conditions in which it believed that a 2-level enhancement under § 3C1.1 could apply, provided examples for how Mr. Kelsey's conduct fit those conditions, and concluded its advocacy on this issue by stating that "the defendant's statements [at the plea-withdrawal hearing] . . . were perjurious and support application of the two-level enhancement." (*Id.*) The result was a government recommendation that the court calculate the Guidelines in a manner that led to a total offense level of 20, which was two levels higher than it had pledged to recommend in the Agreement.

The government's advocacy violated paragraph 9 of that Agreement, which limited the "upward [or] downward adjustments" the government could "recommend to the Court" to those explicitly referenced in paragraphs 9(a)(i) to (v). And it resulted in a higher

recommendation by the government as to the total offense level and (in turn) a higher recommended sentencing range under the Sentencing Guidelines. This vitiated a material part of Mr. Kelsey's consideration for entering the Agreement and thereby violated his due process rights.

Cases from the Supreme Court and this Court make clear that this type of conduct is grounds for reversal. In *Santobello*, for example, the Supreme Court found a violation of a plea agreement on facts similar to the ones here. There, "petitioner 'bargained' and negotiated for a particular plea in order to secure dismissal of more serious charges, but also on condition that no sentence recommendation would be made by the prosecutor." 404 U.S. at 262. Later, he moved to withdraw his guilty plea. *Id*. at 258. But, as in this case, the trial court denied the motion to withdraw. *Id*. at 259. At sentencing, notwithstanding its agreement to not make a sentencing recommendation, the prosecutor recommended that the court impose "the maximum one-year sentence." *Id*. On appeal, the Court declared this sentencing recommendation to be an unlawful "breach of [the plea] agreement" and vacated the judgment. *Id*. at 262-63.

The list of similar cases finding that the government breached a plea agreement is long, and its results are consistent: if the government does not keep its promises at sentencing, reversal is required. *See Ligon*, 937 F.3d at 718 (holding that the government breached the plea agreement by arguing for a sentence within the range of 30-37 months rather than the range of 21-27 months contemplated in the plea agreement); *Warren*, 8 F.4th at 448 (holding that the government breached the plea agreement when it implicitly advocated for an upward departure); *United States v. Fitch*, 282 F.3d 364, 366-68 (6th Cir. 2002) (holding that the government breached the plea agreement by arguing for an increase in the defendant's offense level due to his leadership role, despite agreeing that "no other relevant conduct" would be used to increase the level); *United States v. Foster*, 527 F. App'x 406, 408-11 (6th Cir. 2013) (holding that the defendant was entitled to reversal and a withdrawal of his plea because the government breached the plea agreement when it argued for a higher offense level); *United States v. Barnes*, 278 F.3d 644, 647-48 (6th Cir. 2002) (finding reversible error when the government agreed to recommend that the court sentence the defendant at the low end of the Guidelines but failed to state his

recommendation on the record); *United States v. Swanberg*, 370 F.3d 622, 628-29 (6th Cir. 2004) (finding a violation of the plea agreement "when the district court unwittingly relied upon the information from [defendant's] guilty-plea proffer in imposing the sentence enhancement, and the prosecutor said nothing to correct this error" despite the plea agreement's promise that the proffered information would not be used at sentencing).

All these cases stand for the straightforward proposition that, when the government agrees in a plea agreement to do or *not* do something at or related to sentencing, it must abide by that promise. This case is no different. The government promised not to recommend an upward adjustment to the offense level under § 3C1.1 of the Guidelines, but it did exactly that at the sentencing hearing. This was error, and this Court should reverse.

## III.  NOTHING IN THE AGREEMENT PERMITTED THE GOVERNMENT TO RECOMMEND A 2-LEVEL UPWARD ADJUSTMENT UNDER § 3C1.1.

When the government improperly advocated for the extra two levels, and defense counsel objected, the district court found no error, stating simply: "Well, I asked him what he thought." (R. 157: Sent. Hr'g

23

Tr., Page ID # 1145.) But no question the district court asked or *could* have asked permitted the government to break its promise *not* to recommend a total offense level higher than 18. As this Court explained in *Moncivais*, "[a]lthough the Government has a duty to provide the sentencing court with relevant factual information . . . it may not hide behind this duty to advocate a position that contradicts its promises in a plea agreement." 492 F.3d at 664. Furthermore, here, the district court did not even ask the government a factual question. In any event, general questions from the court do not allow the government to breach a plea agreement by advocating. *Warren*, 8 F.4th at 446. Nor did any other provision of the Agreement permit such advocacy.

Before the district court, the government claimed that its actions were justified by a clause in paragraph 9(c) of the Agreement. As it hinted in its pre-sentencing pleading, (R. 135: Position Regarding Presentence Report, Page ID # 795), and then stated in open court at sentencing, (R. 157: Sent. Hr'g Tr., Page ID # 1144-45), the government claimed that it could advocate in favor of a total offense level *higher* than the limits to which it agreed in paragraphs 9(a)(i) to (vi) of the Agreement so long as the "the Probation Office or the Court contemplate[d]" such an upward

adjustment. This novel interpretation of the Agreement not only contradicts prior positions the government has taken about the same language in other cases, but it also finds no support in the text of the Agreement itself.

### A.    *The Agreement's language prohibits what the government did here.*

The government tried to justify its behavior by citing the penultimate sentence of paragraph 9(c). Some context for that language is necessary. In the three sentences before it, paragraph 9(c) explains the uncontroversial point that the parties' recommendations about the total offense level and criminal history score are "not binding on the Probation Office or the Court." (R. 73: Plea Agreement, Page ID # 216.) As a result, in this paragraph, the defendant acknowledges "that the Court ultimately determines the facts and law relevant to sentencing, that the Court's determinations govern the final guidelines calculations, and that the Court determines both the final offense level and the final guidelines range." (*Id.*) The parties also note here that "the validity of this agreement is not contingent upon the Probation Office's or the Court's concurrence with the above [Guidelines] calculations." (*Id.*) The disputed language follows:

> In the event that the Probation Office or the Court contemplates any U.S.S.G. adjustments, departures, or calculations different from those recommended above, the parties reserve the right to answer any inquiries and to make all appropriate arguments concerning the same.

(*Id*.) The final sentence of the paragraph then clarifies that "if the Court does not accept the guidelines calculations of the parties, [the] defendant will have no right to withdraw his guilty plea." (*Id*.)

In the government's view, this language permitted its prosecutors to advocate in favor of sentencing calculations it agreed *not* to recommend only two paragraphs before. To be sure, so long as "the Probation Office or the Court contemplate[d] any U.S.S.G. adjustments, departures, or calculations different from those recommended [by the parties] above," the government was within its rights to "answer any inquiries and [] make all appropriate arguments" on the topic. (*See id*.) But that gets the government nowhere. The dispute here centers on whether such "answers" and "appropriate arguments" include advocacy in favor of upward adjustments to the Guidelines that the government negotiated away in exchange for the defendant's plea. It does not.

The government claims that these otherwise improper "arguments" somehow transformed to become "appropriate." This is not a reasonable

reading of the Agreement. Contracts are read as a whole. *Maggart v. Almany Realtors, Inc.*, 259 S.W.3d 700, 705 (Tenn. 2008). And they must "be construed harmoniously to give effect to all provisions and to avoid creating internal conflicts." *Wilson v. Moore*, 929 S.W.2d 367 (Tenn. Ct. App. 1996). It is not reasonable to construe one sentence buried in a paragraph explaining the limits of agreements made pursuant to Rule 11(c)(1)(B) as eviscerating the very purpose of such agreements.

Consider the consistency with which paragraph 9(c) refers to "the guidelines calculations of the parties" on the one hand and "the Court's determinations" on another. (*Id.*) There is a reason for that divide: the entire paragraph concerns the situation when the district court's calculations (or possible calculations) of the Guidelines differ from those that the parties negotiated and agreed to in the contract between them. Read as a whole, this paragraph clarifies that such differences may arise in "B" pleas, that it is the *court's* views (rather than the parties') that ultimately control, and that if the final calculations the court makes are worse for the defendant than those the government agreed to recommend, the defendant cannot withdraw his plea as a result.

This language aligns with the mechanisms and purposes of Rule 11(c)(1)(B). That is, in so-called "B" pleas, one of the primary considerations for the defendant to plead guilty is the promise that "an attorney for the government will . . . recommend . . . that a particular provision of the Sentencing Guidelines . . . does not apply." Fed. R. Crim. P. 11(c)(1)(B). Unlike pleas made pursuant to Rule 11(c)(1)(C), the defendant bears the risk that the court will not agree with the parties' recommendations, since he cannot withdraw his plea if the parties' recommendations fail to carry the day. Thus, the substantive benefit of a "B" plea like the one in this case is securing certain recommendations from the prosecutor at sentencing. And the real risk is that the court is not persuaded by them. But, if the government's interpretation were correct, a paragraph the parties included in the Agreement that explains how a "B" agreement operates would allow the government to rescind the primary benefit that such an agreement provides. This cannot be.

Nor need it be, as it is easy to construe paragraph 9(c) in a manner that does not conflict with any other part of the Agreement, including all parts of paragraph 9(a): When the Court or Probation Office is considering a Guidelines calculation that is different from the one the

parties recommended in the Agreement, either party can "answer any inquiry" and "make all appropriate arguments concerning the [topic inquired about]." But the only "appropriate" arguments are those that align with the rest of Agreement, including the parties' joint promise to recommend (or not recommend) certain upward and downward adjustments to the offense level. If, for example, the Probation Office believes the base offense level is lower than the level the parties agreed to recommend, the government can argue that it should be calculated at the higher level included in the plea agreement. But the defendant cannot argue that the Probation Office's lower calculation is correct. The first argument is "appropriate" because it aligns with the parties' promise to one another; the second argument is *not* "appropriate" because it directly contradicts that promise.

This straightforward reading aligns with basic principles of contract interpretation. Not only must contracts be read as a whole, *Maggart*, 259 S.W.3d at 705, and "construed . . . to avoid creating internal conflicts," *Wilson*, 929 S.W.2d at 367, but courts also must "give effect to all the language included" in them, *Lovett v. Cole*, 584 S.W.3d 840, 861 (Tenn. Ct. App. 2019), and not "overlook[ a] term," *Fitch*, 282 F.3d at 367.

Thus, the word "appropriate" cannot be ignored. It serves a purpose, distinguishing between two classes of arguments: those that are "appropriate," and thus permissible under the Agreement, and those that are not.

The Court need not look far to determine what arguments are "appropriate" here, as the parties used the same term in the same section and page of the Agreement to address the same issue of sentencing calculations. There, in paragraph 9(a)(vi), the government and Mr. Kelsey used the term to describe what was not "appropriate"—any "additional upward or downward adjustments" to the offense level other than those they agreed to recommend in paragraphs 9(a)(i) to (v). (R. 73: Plea Agreement, Page ID # 215-16.) Read together, paragraphs 9(a) and (c) create a mechanism for the parties to argue in favor of the upward and downward adjustments they agreed to recommend and argue against those that they did not.

This construction gives meaning to the language of the contract, avoids absurd results, and treats the contract as a whole. One sentence in paragraph 9(c) does not provide an escape valve to permit one party to make an argument prohibited elsewhere; it simply provides a mechanism

to ensure that a party affected by a calculation the Probation Office or district court might make that is different from what a party bargained for can advocate to get the deal the party sought. By contrast, if the word "appropriate" is construed to permit arguments that violate other provisions of the Agreement, the contract collapses upon itself. If such a construction were correct, any time the Probation Office prepared a PSR that included calculations different than those the parties agreed to recommend, the parties' agreement as to that sentencing issue would evaporate. That is not how plea agreements or Rule 11(c)(1)(B) operate. Absent a clear statement of the parties' intent to gamble their consideration away, this Court should not endorse such a result.

### B. The government interpreted the same language very differently in prior cases.

The circumstances of this case are not particularly unusual. But the government's interpretation of the language in paragraph 9(c) is new. In prior cases, the government read it exactly as Mr. Kelsey does here.

In *United States v. McCormick*, for example, the parties' plea agreement contained the same language present here in paragraphs 9(a)(vi) and 9(c). *See* No. 3:15-cr-9 (M.D. Tenn.), R. 37: Order Accepting

Plea Agreement, Page ID # 118-19.[1] There, the district court adjourned the sentencing hearing before imposing a sentence so that the Probation Office could address various misrepresentations the defendant made during the hearing. *McCormick*, No. 3:15 CR 00009-1, 2017 WL 492506, at *1 (M.D. Tenn. Feb. 7, 2017). The Probation Office later recommended an obstruction of justice enhancement due to the defendant's statements, and the Court invited additional briefing from the parties on whether such an upward adjustment was appropriate. *McCormick*, No. 3:15-cr-9, R. 64: Order, Page ID # 394-95. But the prosecutors refused to provide a brief, as they believed such advocacy was barred by the plea agreement. Interpreting identical language as is at issue here, the *McCormick* prosecution team told the district court that "it felt constrained by the terms of the plea agreement not to recommend an enhancement for obstruction of justice." *Id.*, R. 67: Gov. Supp. Resp., Page ID # 410. Even though the defendant himself agreed with the Probation Office that a 2-level upward adjustment was appropriate, the government explained

---

[1]    This Court can take judicial notice of pleadings in *McCormick* and other cases because they are public records available in the PACER system. *See United States v. Ferguson*, 681 F.3d 826, 834 (6th Cir. 2012).

that it could not also agree because it "was concerned that by affirmatively agreeing with the supplemental PSR that an obstruction enhancement should apply, it could be considered to be in breach of . . . the plea agreement . . . ." *Id.*[2]

*McCormick* is not an outlier. In another case with the same plea agreement language, *United States v. Kazarian*, the government took the same position again. There, when the court questioned the lack of support in the record for the parties' sentencing stipulations, it invited them to respond to the court's inquiries by letter. *See* 1:10-cr-895 (S.D.N.Y.), R. 902: Letter by USA to Judge, Page 1. In its letter, the government acknowledged the court's frustration with the plea agreement but made clear that it was bound by the agreement and could not argue that any other sentencing enhancements were appropriate. *Id.* at 1-2. The

---

[2]    To avoid a breach, the government initially "argued that the appropriate consequence for McCormick's prevarication at sentencing should be a loss of acceptance points." *Id*. But the parties in *McCormick* ultimately came to an agreement that they would both agree to recommend the obstruction enhancement in return for the defendant still receiving a reduction for acceptance of responsibility. *Id*. As part of this renegotiated deal, the defendant waived any argument that their new agreement breached the plea agreement. *Id*. at n.2. There was no such renegotiation here.

prosecutors explained that the Second Circuit "has counseled in such circumstances, the Government is constrained from advocating a position at odds with the parties' agreement (or else it will be in breach) . . ." *Id.* at 2.

One such Second Circuit case is *United States v. Mizell*, 671 F. App'x 826 (2d Cir. 2016). There, the government proposed a higher criminal history category at sentencing than stipulated in the plea agreement. *Id.* at 829. Although the defendant did not object to the statements at sentencing, he raised the issue on direct appeal under plain-error review. *Id.* at 827. In response, the government argued that it did not breach the plea agreement because it was responding to the Court's inquiry, pointing to the same language that appears in paragraph 9(c) of the Agreement here. *Id.* at 829. The government also argued that it did not breach the agreement because it was simply fulfilling its duty of candor to the district court. *Id. at* 830. But these arguments did not sway the Second Circuit, which held that the government breached the plea agreement and that "[t]he government's duty of candor does not

excuse or remedy a breach . . ." *Id.*[3] Even though the government ultimately advocated for a sentence within the Guidelines range set forth in the plea agreement, the Second Circuit held that the defendant "had a 'reasonable understanding' that the Criminal History Category calculation the government presented to the district court would match the calculations in the plea agreement." *Id.*

In the end, even if this Court believes the Agreement is ambiguous, "[a]mbiguities in a plea agreement must be construed against the government." *Ligon*, 937 F.3d at 718; *see also Warren*, 8 F.4th at 448. That is the case because "both constitutional and supervisory concerns require holding the government to a greater degree of responsibility than the defendant." *Fitch*, 282 F.3d at 367-68. When a defendant gives away his constitutional right to a trial by jury, he must do so in clear terms. As the circuit courts in both *Fitch* and *Mizell* counseled, a defendant's interpretation of the contract must win the day as long as it is "reasonable." *Id.* at 367 ("it was eminently reasonable for Fitch to believe

---

[3]    The appellate court did not reverse the conviction, however, because the defendant did not fulfill the other requirements for relief under the plain error standard of review.

that when the government agreed to recommend that no other 'relevant conduct' be used to increase her base offense level, the government foreclosed any further opportunity to increase her sentence . . . ."); *see also Mizell*, 671 F. App'x at 830; *Ligon*, 937 F.3d at 718. In this case, it was more than reasonable for Mr. Kelsey to assume the Agreement would be interpreted in a harmonious way—the same way prosecutors interpreted it in *McCormick* and *Kazarian*, and the same way the government interpreted this very Agreement prior to breaching it. For that reason, Mr. Kelsey's understanding that the government could not argue for an obstruction of justice enhancement under the Agreement must carry the day.

## IV. THE COURT SHOULD REMAND TO GIVE MR. KELSEY THE OPPORTUNITY TO WITHDRAW HIS PLEA.

Because the government breached Mr. Kelsey's plea agreement, his sentence should be vacated, and he should be given the choice to "be resentenced by a different judge" or "the opportunity to withdraw his plea of guilty." *Santobello*, 404 U.S. at 263. In this case, Mr. Kelsey strongly prefers to withdraw his guilty plea. Therefore, as this Court has decided, he is "entitled to the two options of specific performance or rescission of

the plea, but he must be permitted to meaningfully exercise his option to rescind." *Foster*, 527 F. App'x at 411.

## CONCLUSION

WHEREFORE, for the above reasons, Mr. Kelsey asks the Court to vacate the district court's sentence, and remand with instructions to the district court to allow him to withdraw his plea bargain based on the government's breach.

Respectfully submitted,

By:    /s/ J. Alex Little
       J. ALEX LITTLE (TN BPR #029858)
       ZACHARY LAWSON (TN BPR #036092)
       Burr & Forman LLP
       222 2nd Ave S, Suite 2000
       Nashville, TN 37201
       Telephone: (615) 724-3200
       Facsimile: (615) 724-3290
       Email: alex.little@burr.com
       *Counsel for Brian Kelsey*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME, TYPEFACE, AND STYLE REQUIREMENTS

This brief contains complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), because it contains 7,027 words according to the Microsoft Word word processing program, excluding the parts of the brief exempted by the Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in 14-point Century Schoolbook font.

By:    /s/ J. Alex Little
J. Alex Little
*Counsel for Brian Kelsey*

Dated: November 14, 2023

## CERTIFICATE OF SERVICE

I hereby certify that I served this brief on all counsel of record through the Court's CM/ECF system on November 14, 2023.


By:    /s/ J. Alex Little
               J. Alex Little
               *Counsel for Brian Kelsey*

## ADDENDUM

## APPELLANT'S DESIGNATION OF
## RELEVANT DISTRICT COURT DOCUMENTS

Appellant, pursuant to 6th Circuit Rules 28(c) and 30(b), designates

the following relevant District Court documents in the electronic record:

| Record Entry | Description of Document | Page ID # |
|---|---|---|
| 1 | Indictment | 1-15 |
| 71 | Minutes of 11/22/2022 Plea Hearing | 198 |
| 73 | Plea Agreement | 206-22 |
| 93 | Defendant Kelsey's Motion to Withdraw Plea and File Motion to Dismiss | 285-342 |
| 114 | Minutes of 5/16/2023 Hearing on Motion | 458 |
| 116 | Order | 460 |
| 135 | Position of the United States Regarding Presentence Report | 793-99 |
| 155 | Judgment in a Criminal Case | 1103-10 |
| 157 | Transcript of 08/11/2023 Sentencing Hearing | 1133-1253 |
| 160 | Corrected Notice of Appeal | 1257-58 |
| 167 | Presentence Investigation Report | 1323-53 |
| 177 | Memorandum Opinion and Order | 1429-36 |